1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11                                    ) Civil No.13-0103 LAB(WVG)
      MEKI WALKER GAONO,              )
12                                    ) REPORT AND RECOMMENDATION
                       Petitioner,    ) DENYING PETITION FOR WRIT
13                                    ) OF HABEAS CORPUS
      v.                              )
14                                    )
      M. LONG, Warden,                )
15                                    )
                       Respondent.    )
16                                    )
      _____ )
17

18    **I.    <u>INTRODUCTION</u>**

19          Petitioner Meki Walker Gaono (hereafter "Peti-

20    tioner"), a state prisoner proceeding *pro se*, has filed a

21    Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

22    § 2254 (hereafter "Petition"). On April 20, 2009,

23    Petitioner was convicted by jury in San Diego Superior

24    Court case SCN222540 on two counts. (Lodgment 1 at 1103-

25    11.) Petitioner was convicted on Count One of first-degree

26    murder while lying in wait (Cal. Penal Code § 187) with

27    special circumstances. (Lodgment 1 at 1103-07.) The jury

28    also found Petitioner guilty on Count Two of assault with

                                1

1    a firearm on a peace officer engaged in the performance of
2    his or her duties (Cal. Penal Code § 245(d)(1)) with
3    special circumstances. (Lodgment 1 at 1108-10.)

4        Petitioner contends he is entitled federal Habeas
5    Corpus relief on the following four grounds: (1) his
6    statements were involuntary, coerced and obtained in
7    violation of <u>Missouri v. Seibert</u>, 542 U.S. 600, 124 S. Ct.
8    2601 (2004), when Detective Brown deliberately used a two-
9    step procedure calculated to circumvent <u>Miranda v. Ari-</u>
10   <u>zona</u>, 384 U.S. 436, 86 S. Ct. 1602 (1966), (2) Detective
11   Brown's testimony at the pretrial hearing and at trial
12   materially differed regarding the facts, revealing a
13   <u>Seibert</u> violation, (3)Petitioner was denied his right to
14   present a complete defense as a result of the trial
15   court's exclusion of an expert witness, and (4) since
16   there were cumulative and collective errors, Petitioner's
17   trial was prejudiced and reversal is mandated. (Pet. at 6-
18   9.)

19       The Court has considered the Petition, Respondent M.
20   Long's (hereafter "Respondent") Answer, and all the
21   supporting documents submitted by the parties. Based upon
22   the documents and evidence presented in this case, and for
23   the reasons set forth below, the Court RECOMMENDS that the
24   Petition be DENIED.

25   **II.**    **FACTUAL BACKGROUND**

26       The following statement is taken from the California
27   Court of Appeal opinion, <u>People v. Meki Gaono</u>, No. D0552-
28   90, slip op. (Cal. Ct. App. Sept. 29, 2011). (Lodgment No.

13cv0103

12.) This Court gives deference to state court findings of fact and presumes them to be correct. Tilcock v. Budge, 538 F. 3d 1138, 1141 (9th Cir. 2008). Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. Id.; See also 28 U.S.C. § 2254(e)(1). The facts as found by the state appellate court are as follows:

### 1. Historical Background

The neighborhood where the shooting occurred is a high gang crime area. In particular, a gang known as the Westside Deep Valley Bloods ("WDVB") is active in the neighborhood. At the time of the events in this case, a number of WDVB gang members lived on the 500 and 600 blocks of Arthur Avenue, and on nearby streets.

In 2006, Oceanside Police Officer Dan Bessant, a member of the Oceanside Police Department's Neighborhood Policing Team, was assigned to an area that included the neighborhood near the intersection of Arthur Avenue and Gold Street. Bessant, accompanied by code inspection offi- cers, had visited the homes of known WDVB gang members, including the residences of the Toluao family and the Seau family. Members of both of these families were known as 'shot-callers' of the gang, which meant that they were considered to be leaders of the gang.

### 2. The Shooting

On December 20, 2006, Oceanside Police Officer Karina Pina was on patrol with a civilian ride- along, Jacqueline Castaneda. Officer Pina was in uniform and was driving a marked police vehicle.

At approximately 6:15 p.m., Officer Pina initi- ated a traffic stop of a vehicle that had ex- pired registration tags. The driver of the vehicle pulled over at the intersection of Arthur Avenue and Gold Drive. Pina approached the vehicle, obtained the driver's information, and returned to her police vehicle. Castaneda got out of the police car and stood next to it.

A few minutes after the traffic stop, Officer Bessant, who was also in uniform, arrived at the

location and parked his marked police vehicle behind Pina's.

The location where the three cars were parked was dark. There was only one functioning street-light nearby. The headlights and overhead lights on Officer Pina's car provided some additional lighting. Officer Bessant had turned on the amber lights on top of his vehicle, but not the overhead lights. Officer Bessant stood nearby while Officer Pina wrote out a citation for the driver of the car.

At approximately 6:30 pm., Officer Pina heard a number of 'whizzy sounds go by.' She saw Officer Bessant grab himself under his left arm and turn away from the 600 block of Arthur Avenue. Casta-neda heard four to six shots in rapid succes-sion. After the first shot, Castaneda heard Officer Bessant say, 'Oh no, Oh no.' After a very brief pause between the first three or four shots, Castaneda heard one or two louder shots, which she believed had come from a higher cali-ber weapon.[1]

After the shots were fired, Officer Bessant drew his firearm and immediately moved toward the right front side of Officer Pina's police vehi-cle. According to Castaneda, Bessant appeared to be injured as he moved toward Pina's car. Lean-ing against the right front fender of Pina's vehicle, Bessant slid to the ground and dropped his gun.

After hearing the shots, Officer Pina looked toward the 600 block of Arthur Avenue, but was unable to see anything because it was so dark in that area. She could not see anyone and could not pinpoint where the shots had come from. Pina fired one shot in the direction of the 600 block of Arthur Avenue.

Officer Pina became aware that Officer Bessant was critically injured. She called in over her police radio that an officer was down and needed immediate assistance. Sergeant Jeffery Brandt responded to the scene of the shooting within a few minutes of Pina's call. Brandt approached Officer Bessant, who was slumped on the ground, leaning against Pina's vehicle. Sergeant Brandt tried to get Bessant to tell him where he was injured since Brandt could not see Bessant's injury, but Bessant only blinked in response.

---

[1]Castaneda had prior law enforcement training.

1   After approximately 10 or 15 seconds, Bessant's
2   'pupils basically fix[ed]' and there was 'no
    life left in him.'

3   On December 21, 2006, deputy medical examiner
    Jonathan Lucas performed an autopsy on Officer
4   Bessant. Lucas determined that a .22 caliber
    bullet had entered Bessant's chest cavity from
5   his left side, punctured his heart and passed
    through his liver, and finally came to rest in
6   the right corner of Bessant's chest cavity.

7   *3. Other Witnesses*

8   A number of neighbors who were in the area that
    night around the time of the shooting saw a
9   group of between three and six males standing
    near the mailbox in front of the residence at
10  622 Arthur Avenue.[2] Other witnesses reported
    that they saw a big, stocky man with bushy hair
11  among the group.

12  A neighbor who lived across the street from 622
    Arthur Avenue also reported that one of the men
13  had big, bushy hair. She heard the men arguing,
    and later heard three to eight gunshots. When
14  she looked across the street again, the men were
    gone.
15
    Another neighbor who lived across the street had
16  walked next door to drop something off. On her
    way back to her house, she saw a big man walking
17  north. She heard the man say, 'Come on, let's go
    get it. Let's go get it. It's in the house.' By
18  that time, the men had begun to disperse, and
    all of them appeared to be walking north. After
19  the witness entered her house, she heard noises,
    like rapid firecrackers, which sounded like they
20  were coming from just outside her door.

21  Jade Morales had been working on her car when
    she heard three or four loud firecracker noises.
22  She then saw two men quickly walking north. One
    of the men was skinny and was wearing a red t-
23  shirt.[3] The other man was stocky and had 'poofy'
    hair. This man was wearing a white t-shirt and
24  might have been carrying a rifle. Morales'
    brother had also noticed two or three men,
25  including Jose Compre and possibly Penifoti

26  _____

27  [2]622 Arthur Avenue was Jose Compre's residence.

28  [3]A gang expert testified that members of the WDVB used the
    color red to represent their gang affiliation.

Taeotui, standing near the mailbox at 622 Arthur
Avenue shortly before the shooting.

A neighbor who lived three houses north of 622
Arthur Avenue heard the sound of two sets of
gunshots coming from a location south of her
house, and saw two men running north. One of the
men was carrying a long silver object against
his chest.

Another neighbor, Julio Mata, who lived across
the street and north of 622 Arthur Avenue, had
left his house to move a trailer around the
corner. While he was parking the trailer, he
heard gunshots. Mata walked back to his house
and saw Petitioner run into the side entrance of
680 Arthur Street holding a black three-and-a-
half-foot long object under his arm. Mata then
saw four other people run into the residence at
661 Arthur Avenue. Mata's mother, who had been
waiting for him in front of their house, heard
gunshots and saw a young man running in her
direction. He was carrying something under his
arm, and he ran between the residence at 680
Arthur Avenue and the house next door. This
witness also saw several other men run into the
house at 661 Arthur Avenue, which was the Seau
family residence.

Mata and his mother started to drive to the
store, but when they were halfway there, they
turned around. When they returned to their
residence, they saw Petitioner come out of his
house wearing shorts and no shirt. Petitioner
was looking south, in the direction of the
police officers.  Mata approached a police
officer and told him that he had seen a person
run into Petitioner's house carrying a long
object.

Elizabeth Musser is a neighbor of Karalena
Gaono, who is Petitioner's cousin. At around
7:00 p.m. that night, Musser heard a helicopter
and went outside to see what was going on.
Musser saw Karalena at home. A few minutes
later, Musser saw a stocky man with 'puffy' hair
and a white t-shirt run into Karalena's house.[4/]

Karalena Gaono admitted that Petitioner had
called her on the night of the shooting. She
testified that he called her only to ask her how

_____

[4/]According to Karalena and another neighbor, Penifoti Taeotui
was stocky, over six feet tall, weighed 280 pounds, and had "puffy"
hair.

6

she was doing and whether she had heard all of the sirens. Karalena admitted that after she received the call from Petitioner, Taeotui arrived at her house and asked to use her telephone. After using Karalena's telephone, Taeotui left.

*4. The Investigation*

Officers recovered seven .22-caliber shell casings and a single nine-millimeter shell casing from the street in front of 622 Arthur Avenue. Samples taken from the brick mailbox at that residence tested positive for gunshot residue.

Officers found a black guitar case in a locked shed in Petitioner's backyard. Inside the guitar case was a .22 caliber rifle with a scope. In addition, officers found a .22 caliber revolver, wrapped in a towel, in a drawer in Petitioner's kitchen. The revolver's cylinder contained nine expended .22 caliber cartridges in it, which meant that there had been nine bullets in the revolver, and that all nine had been fired.

Petitioner's DNA and fingerprints were found on the rifle. The scope of the rifle contained a mixture of DNA from four people, including Petitioner, Taeotui, and Compre and a fourth, unidentified person. The wooden portion of the rifle contained a mixture of DNA from Petitioner, Taeotui, Compre, Randy Seau, and Sala Toluao. Petitioner's left thumb print was found on the scope of the rifle. Police identified other figerprints on the rifle as Petitioner's, as well.

Taeotui's DNA was found on the handle of the .22 caliber revolver. Officers found a sock that contained 146 .22 caliber bullets in a closet in Taeotui's living room.

Officers found a nine-millimeter cartridge in the pocket of a pair of Compre's shorts. They also found a box of nine-millimeter ammunition wrapped in a black bandana behind a dryer in Compre's garage. Compre's fingerprints were on the box.

In March 2008, a resident of the house behind Compre's residence found a nine-millimeter handgun wrapped in a blue shirt near the fence that divided his yard from Compre's yard. The gun was covered in cobwebs and dirt, and appeared to have been there for a while. Investig-

13cv0103

ators found no fingerprints or any testable DNA samples on the handgun. However, testing revealed that the nine-millimeter shell casing found in front of Compre's house after the shooting had been ejected from the handgun that was found behind Compre's house.

Samples of DNA taken from cigarette butts that were found in front of 622 Arthur Avenue matched DNA from Petitioner, Taeotui, and Randy Seau.

A criminalist determined that the bullet that killed Officer Bessant was fired from the .22 caliber scoped rifle. The seven casings recovered from the area had been expended from that rifle.

On the basis of tests that were conducted to determine the 'drop distance' of a bullet fired from the rifle at a target 386 feet away, the examiner concluded that the rifle had been aimed at Bessant's head.[5] The criminalist also explained that a nine-millimeter firearm makes a much louder sound than a .22 caliber firearm. In addition, although there is a subtle difference between the sounds made by a .22 caliber revolver and the sounds made by a .22 caliber rifle, any difference would be 'masked' if they were fired simultaneously.

*5. Gang Evidence*

Oceanside Police Detective Gordon Govier testified that the WDVB gang is a criminal street gang that has nearly 100 documented members and/or associates. Govier testified that the gang's primary activities include murder, attempted murder, assault with deadly weapon, robbery, carjacking, burglary, illegal possession of firearms, drug sales, and vandalism.

Petitioner associated with members of the WDVB criminal street gang and appeared to be a member of the gang. Police had identified Petitioner as a WDVB gang member in December 2006.

Govier testified that in his opinion, the shooting was committed for the benefit of the WDVB gang. According to Govier, younger members of the gang, such as Taeotui, Petitioner and Compre, would increase their status in the gang

---

[5] The distance between the mailbox in front of 622 Arthur Avenue and Officer Bessant's location at the time he was hit was approximately 386 feet.

by shooting at a police officer. Such younger members tended to look for opportunities to earn higher status in the gang or to prove themselves.

*6. Petitioner's Statements to Police*

Petitioner spoke with police detectives at the police station for many hours overnight on the night of the shooting. In addition, Petitioner led detectives on a walkthrough of his residence in the early morning hours the day after the shooting. Detectives also visited Petitioner while he was in juvenile hall on December 22 and 23. Detectives did not question Petitioner on December 22 because he asked to have his mother present before answering any questions. A detective returned the following day with Petitioner's [mother], and then talked with Petitioner about the shooting of Officer Bessant.

Prior to trial, pursuant to a pretrial motion to suppress, the trial court excluded some of the statements that Petitioner made to detectives during certain portions of the interviews. However, the court permitted the prosecution to introduce the tape recordings and transcripts of other portions of Petitioner's interviews. Among the statements that the court allowed in evidence were statements that Petitioner made at approximately 3:30 a.m. on December 21, to the effect that he had been drinking beer that day in the park, and that he had picked up the guitar case that contained the rifle for protection while he walked around to sober up. Petitioner stated that when he saw the police officers near Arthur Avenue, he was scared that they would arrest him for being intoxicated, so he pulled out the rifle and a .22 caliber handgun and fired at both of the officers simultaneously. After firing at the officers, Petitioner ran home.

On December 23, at juvenile hall, Petitioner told a detective that he fired the rifle at Officer Bessant while standing near the mailbox at 622 Arthur Avenue, that Jose Compre had fired the nine-millimeter handgun, and that another individual whom Petitioner did not name had fired the .22 caliber handgun.

    *a. The Relevant Interviews*

At approximately 8:30 p.m. on the night of the shooting, police officers who were outside of Petitioner's house investigating the shooting

noticed activity in the home, and also noticed the front door was open. Officers ordered Petitioner's aunt and uncle, Lola and Tele, as well as Petitioner, out of the house. Once all three were outside, the officers handcuffed them for the purpose of securing the officer's safety. Petitioner was wearing shorts, but was otherwise unclothed and was not wearing shoes. A police officer offered Petitioner a blanket, and also repositioned Petitioner's handcuffs to allow his arms to be in front of him, so that he would be more comfortable. Petitioner was told that he could sit in a heated patrol car. Petitioner initially refused this offer, but later accepted. At around 10:30 p.m., Petitioner agreed to go to police headquarters to be interviewed. Officers were not sure at that point whether Petitioner was a witness or a suspect.

### i. The Midnight Interview

Petitioner, Lola, and Tele were transported to the police department, where they waited in the lobby with other people who were also waiting to be interviewed. Detective Brown had told Petitioner that he was not under arrest and had taken off Petitioner's handcuffs, explaining to him that the handcuffs had been used only as a precaution, to ensure officer safety.

At around 12:00 a.m., Detective Brown and Detective Jeff Novak placed Petitioner in an interview room. The room contained a table with one chair on one side, and two chairs on the opposite side. The room was equipped with a video camera that recorded the interview.

Detectives Brown and Novak began the interview by asking Petitioner about his residence and who else lived there, and then asking him what he had been doing, and where he had been earlier in the day and into the evening. Petitioner told detectives that after he left school at about 1:30 p.m., he had gone to a nearby park, and that he had returned home at around 5:30 p.m. Petitioner claimed that he had not been aware of the shooting that took place on his street until he went outside to get firewood. At that time, Petitioner said, he noticed a police helicopter circling above the neighborhood. Petitioner told the detectives that he did not see anyone out and about, and that he had not seen anything going on.

### *ii. The Two-Hour Break*

After approximately 45 minutes, Detective Brown and Novak left the interview to attend a briefing on the case. While Brown and Novak were attending the briefing, Detective Karen Priem stayed with Petitioner in the interview room. Petitioner asked Priem whether he could leave the police station, and she responded that because he was 17 years old, she could not let him leave alone. Petitioner asked whether his mother[6] was still at the station, and indicated that he wanted to leave. Detective Priem responded that she did not 'know what the status is,' and asked him to 'hang in there for [her].' She encouraged him to rest while they waited.[7]

### *iii. The 2:40 a.m. Statements*

Detective Brown returned to the interview room just before 2:40 a.m. At the briefing, Brown learned that a witness had informed police that he believed he had seen a person running into Petitioner's house carrying a long object. The witness said that the person whom the witness saw running into the house was 'the kid that lives there.'

Detective Brown reinitiated his interview of Petitioner, and asked Petitioner to go over again what Petitioner had been doing earlier in the day on December 20. After Petitioner related a number of details about what he had done that day, Detective Brown asked Petitioner if he knew why they would be asking him questions that they already know the answers to. Petitioner responded, '[t]o see if I was telling the truth.' Detective Brown indicated that there was some things that Petitioner was telling the detectives that did not make sense, and asked Petitioner to clear those things up. Detective Brown told Petitioner that other people had seen what had happened and had picked Petitioner out of a photographic lineup. The following exchange then took place:

---

[6]Although Petitioner appears to have been discussing his aunt, Lola, he often referred to her as his "mom" or "mother."

[7]Around this time, Detective Priem asked another detective to sit with Petitioner while she checked to see if his mother was still at the police station. (Lodgment 6 at 3494.) A short while later, Detective Priem returned and reassured Petitioner that his mother was still there and would wait for him. (<u>Id.</u> at 3495.)

'Det. Brown: You've told us a lot of things that aren't true. Now's your chance to tell us what is true. Tell us why this all went down, why this happened, rather than let us go with what it looks like.'

'Petitioner: I just want to go home, man.'

'Det. Brown: I understand. But you made a mistake. And you're not telling us the truth. You - you saw all the people that are out there; right? Okay? We're at your house right now. We found some things. Okay? And we've taken statements from witnesses that saw it go down.'
. . .

'Do you want to tell us what really happened instead of lies? Tell us what happened.'

'Petitioner: I was just standing down the street. I was drunk. (Inaudible.) I don't even know what I was thinking. I was just running back home. (Inaudible.)'

Petitioner proceeded to tell the detectives that he had run down the street carrying two guns, a .22 caliber rifle and a .22 caliber revolver, and that he had put at least one of the guns in the shed in his yard. Petitioner said that he [had] been carrying the guns in a guitar case because he was scared of Crips and of other people who had been messing with him at school. Petitioner initially said that when he saw the police cars, he aimed and shot in the air, but later admitted that he had aimed 'at the officer,' whom Petitioner thought was 'pulling [him] over.' The detectives continued to talk with Petitioner and ask him more questions about his story and the events of that night. At some point Detective Novak left the room. When he returned, he asked for Detective Brown's help outside the room.

*iv. The Post-<u>Miranda</u> 3:30 a.m. Statements*

At approximately 3:30 a.m., Detectives Novak and Brown returned to the interview room. At that point, Detective Brown read Petitioner his <u>Miranda</u> rights. Petitioner agreed to continue talking with the detectives. Petitioner asked whether the officer who had been shot was 'okay.' Detective Brown told Petitioner that he did not know the status of the officer. Petitioner also said that he wanted Detective Brown to 'know that [he was] really sorry.'

13cv0103

Detective Brown then asked Petitioner to tell them what had happened, from the beginning. Petitioner reiterated that he had been drunk, that he saw the police car, and that he saw a police officer walking back and forth between two cars. Petitioner fired the rifle first, in the direction of the officer. He fired a total of four to six shots, using both the rifle and a gun that he had in his pocket. Afterward, he started running home.

### v.  Videotaped  Walkthrough  of Petitioner's Residence

At 5:06 a.m., Detective Brown took Petitioner to Petitioner's residence and videotaped Petitioner while he guided police on a walkthrough of the house and a shed in the backyard. Petitioner pointed out where he had put the rifle and the .22-caliber revolver, and also pointed out the location of the clothes that he had been wearing at the time Officer Bessant was shot. [During the walkthrough, Petitioner asked Brown, '[d]o I still have the right to remain silent?' Detective Brown told Petitioner that he did retain that right. After receiving this response to his question, Petitioner continued to conduct the walkthrough.]

The officers and Petitioner returned to the police station at approximately 6:20 a.m., after which Petitioner was arrested and taken to juvenile hall.

### vi. The December 22 Interview

On December 22, Detectives Brown and Sylvia O'Brien went to juvenile hall to conduct a follow-up interview with Petitioner. Petitioner was aware by this time that Jose Compre had been arrested and that Compre was also in custody at juvenile hall.

Brown told Petitioner that other people had told the police things that made Petitioner 'look really bad.' Brown said that he wanted to talk to Petitioner about 'all the things that came up.' Brown then read Petitioner his <u>Miranda</u> rights.

Despite Brown's efforts to encourage Petitioner to talk with the detectives, Petitioner told them that he was not willing to speak with them until his 'mom or father get here.' A little bit later, Petitioner said that he could not 'talk about anything until my parents get here

13cv0103

or until I have both of my parents present or my lawyer.'   Detective O'Brien asked Petitioner whether he would be willing to speak with the detectives if they came back with Pua, Petitioner's stepgrandmother[8]. Petitioner indicated that he would speak to the detectives if Pua came with them when they returned.   At this point, Brown ended the interview.

### vii.   The December 23 Interview

At just after 8:00 a.m. on December 23, Detectives Brown and O'Brien returned to juvenile hall.  O'Brien had picked up Pua Gaono, and she accompanied the detectives to the interview room.  After Petitioner was brought into the room, he and Pua spoke briefly in both Samoan and English.  At one point, Pua said, 'Are you sure?  That's your choice.'  She also said to him, 'Make sure you're making the right choice, Meki.  Make sure you're making the right choice. I'm here for you, and your dad, he is here for you.  You know, okay—so tell them.'

Detective Brown started to tell both Petitioner and Pua what he wanted to talk with Petitioner about, and said that he wanted to clear up some information.  He then said, 'And just so your mom hears it, I don't want her to think and I don't want you to think that I'm pulling anything over your eyes.  You already know this is no big deal.  Let her know.'  At this point, Detective Brown again read Petitioner his <u>Miranda</u> rights.

Petitioner told Brown that he and a few other guys had been drinking in front of Compre's house near the mailbox when the group saw a police car pull over a vehicle.  Petitioner said that he 'had the rifle' and began shooting toward the police cars.  Petitioner fired approximately five or six times.  He heard other gunshots, as well.  After shooting the rifle, Petitioner put it back into a bag and ran home. When he arrived at his residence, he put the rifle in a shed in the backyard.

Petitioner admitted knowing that someone else had a .22 caliber revolver at the time the officer was shot, but he would not say who that

---

[8]It appears that Petitioner referred to both his Aunt Lola, and his stepgrandmother, Pua, as his "mother."

person was.   He implicated Compre as the person who had shot the nine-millimeter handgun.[9]

b.   The Suppression Hearings

The trial court heard argument from the parties during two hearings, the preliminary hearing and a subsequent hearing, regarding Petitioner's motion to suppress the statements that he made to police officers.   Petitioner challenged the admissibility of the statements that he made during four interviews: (1) the late December 20/early December 21 interview at the police station; (2) the videotaped walkthrough of Petitioner's residence, narrated by Petitioner; (3) the attempted postarrest interview at juvenile hall on December 22; and (4) the interview at juvenile hall on December 23.   Petitioner contended that the interviews violated his Fifth and Fourteenth Amendment rights, on the grounds that his statements were coerced and that officers had violated his rights under <u>Miranda</u> and <u>Seibert</u> [citations omitted].   Petitioner's argument that his statements were coerced was based on a number of his personal characteristics, including the fact that he was young, unsophisticated, mostly undressed, cold, and sleep-deprived, and also the context in which the interviews took place, including that he had been subjected to lengthy interrogations during which the detectives employed a number of coercive interrogation techniques.

At the preliminary hearing, the prosecutor asked Detective Brown what he knew about 680 Arthur Avenue when, on the night Officer Bessant was shot, he received an assignment to meet with Escondido officers who were with the residents of 680 Arthur Avenue.   Detective Brown said that he 'knew a witness had possibly seen somebody run from the area where they believed the shooting was committed from, possibly into that residence carrying a long object,' but that he had no other information.   When Brown met with the witnesses, he noticed that they were all handcuffed, so he called the station to determine whether the individuals were witnesses or suspects.   Detective Brown was told that all

---

[9]In March 2008, a resident of the house behind Compre's residence found this handgun wrapped in a blue shirt near the fence that divided his yard from Compre's yard.   (Lodgment 12 at 9.) Testing later revealed that the nine-millimeter shell casing found in front of Compre's house after the shooting had been ejected from this handgun.   (<u>Id.</u>)

three were witnesses, and the he should treat them as witnesses.

Detective Brown, who was going to transport Petitioner to the police station, took off Petitioner's handcuffs and 'asked him if he understood why the handcuffs had been put on him, that they were for safety purposes only.' Petitioner indicated that he understood.  Brown then informed Petitioner that he was not under arrest, but that the police wanted to speak with him at the station, if he would agree to go. Petitioner said that he understood that he was not under arrest, and agreed to go to the station to be interviewed.

Detective Brown testified about the logistics and circumstances of his interview of Petitioner on the night that Officer Bessant was shot and into the next morning, including what transpired when he left the interview room after approximately 40 minutes to attend a briefing.  When asked whether he knew 'Petitioner had been identified as the person a witness had seen going into 680 Arthur after the shooting,' Brown said, 'I don't know that [that] was where he was identified.  I know that people had mentioned he lived there, and I knew that it was a possibility that he could have been the person that ran in there.'  After a few follow-up questions to which objections were sustained, the prosecutor asked Brown, 'At the time you were coming back into the interview room after you had the briefing conference—you're returning from the break in other words—had anybody identified or told you that Petitioner had been identified as the person who was seen running into 680?  Had that information been given?'  Detective Brown responded, 'Not identified.  Just that he met the description of the person seen running in there—.'

The prosecutor then asked Detective Brown about Petitioner's statement, 'I just want to go home, man.'  Specifically, the prosecutor asked Detective Brown if he remembered an earlier conversation with the prosecutor during which the prosecutor inquired as to why Brown had continued to question Petitioner after Petitioner told Brown that he wanted to go home, and what his reaction had been to the prosecutor's inquiry.  Detective Brown said, 'Yeah.  I remember I was really upset.  I was actually upset at you for saying that.  I thought you were dead wrong, and I was 100 percent convinced that that never happened.' According to Detective Brown, in response to

being shown a transcript of the interview, he had been 'very surprised' because he 'didn't think there was any way in heck that could have happened.'   When asked what he believed had occurred, why he was shocked, and how he could have continued asking Petitioner questions after Petitioner said that he wanted to go home, Detective Brown answered, 'After having read the transcript and actually view[ing] the video of that occurring, I knew exactly what happened. It was obvious to me from watching what was going on and hearing what was being said, it was obvious my ears heard something being said, but I was in the middle—I distinctly remember being in the middle of a thought and it didn't regis- ter what the words were said [*sic*]. It's kind of like when you're doing something, watching TV or something and your family, you know, interrupts and asks you a question and you answer that and later they bring that up and you have no idea that it occurred because you really weren't paying attention to what they said.'

The prosecutor also asked Detective Brown about the timing of his advising Petitioner of his <u>Miranda</u> rights.   After asking Detective Brown questions about his and Detective Novak's leav- ing the interview room and later returning, the prosecutor asked, 'Now, why did you admonish Petitioner at that time?'   Brown responded, 'Because I recognized based on his admissions and what we knew at that point that he was going to be arrested.   There was no if's, ands, or buts, and that would require me to <u>Mirandize</u> him in order to continue talking to him.'

Defense counsel also questioned Detective Brown about Petitioner's statement, 'I just want to go home,' on cross examination.  During that exami- nation, the following colloquy occurred:

'Q.  It [i.e. Petitioner's statement about going home] was of sufficient significance that it made you upset that you missed it, correct?

'A.  I believe it could be of possible signific- ance, and I would have addressed things a little bit differently had I been aware of that.

'Q.  Because you know that when you're telling somebody that they're free to leave and they're not in custody and you're taking statements from them, you know that when they say things like 'I want an attorney' or 'I want to leave' or 'I want to end this interview,' you have to abide by those things, correct?

1   'A.   That's correct.

2   'Q.   And you're trained in that.  You know this
    stuff, right?

3   'A.   Yes, sir.
4   '[¶] ... [¶]

5   'Q.   Well, we gave the court a copy of the
    transcript and the tapes.  But your response is
6   similar to 'I just want to go home, man.'  You
    say, "I understand'; is that correct?

7   'A.   That's what I said, yes.

8   'Q.   So your mind was somewhere else, but you
9   said you understood.

10  'A.   I said that.  Having viewed it, I believe I
    was in the middle of a thought, and it was,
11  'Hang on.  Let me complete what I'm thinking
    here.'

12  Defense counsel asked Detective Brown some other
13  questions about the interview, and pointed out
    some of the incriminating statements that Peti-
14  tioner had made.  Counsel then asked, '[W]ell,
    let me ask you.  Just at that point [after
15  Petitioner had said he 'was just aiming and
    shooting']–wow, did it occur to you at that
16  point that maybe I need to read him his rights
    because–did it occur to you?'  Brown answered,
17  'Not at that point because I don't make arrests
    until I corroborate a confession.'

18
    Upon further inquiry by defense counsel, Detect-
19  ive Brown acknowledged that one of the reasons
    that he and Detective O'Brien wanted to inter-
20  view Petitioner on December 22 at juvenile hall
    was because 'there may have been a problem with
21  the [original] interview.'

22  A few days later, the trial court heard argument
    from the attorneys concerning whether some or
23  all of the statements that Petitioner made to
    police should be suppressed.  Defense counsel
24  argued that the statements that Petitioner made
    in the early morning hours of December 21 were
25  coerced and involuntary, and that the detectives
    had engaged in a deliberate two-step interrogat-
26  ion process that violated <u>Seibert</u> when they
    first obtained incriminating statements from
27  Petitioner, read him his <u>Miranda</u> rights only
    after obtaining the statements, and then procee-
28  ded to obtain additional incriminating state-
    ments after having advised Petitioner of his

18

rights.  Defense counsel argued that the incrim-
inating statements that Petitioner made on
December 23 were also obtained in violation of
Seibert, and further argued that Petitioner had
invoked his rights to silence and to an attorney
on the day before this interview took place,
when he ask for his parents or a lawyer.

During the discussion among the court and the
attorneys, it became clear that the prosecution
was not seeking to introduce Petitioner's 2:40
a.m. statements, from the time that Petitioner
said, 'I just want to go home, man,' until
Detective Brown advised Petitioner of his rights
under Miranda.  With respect to Petitioner's
other statements, the prosecutor argued that
there was no evidence that Petitioner had been
coerced into making the statements.  The prosec-
utor cited the fact that Petitioner was not
handcuffed when he made the statements, that he
was offered blankets, food, and drinks, and that
he was allowed to use the restroom and to sleep.
In addition, the prosecutor noted that Peti-
tioner had not complained of discomfort during
the interviews.  At one point during the interv-
iews, just before Detectives Novak and Brown
took a break, Petitioner even asked whether he
could continue talking with them when they
returned.

The trial court delivered its initial ruling on
the suppression motion at the preliminary hear-
ing.  The trial court noted that it had reviewed
the transcripts and both video and audio record-
ings, in addition to having read the parties'
motion papers.  The court concluded that none of
the statements that Petitioner made to police at
the police station on December 21 were coerced
or involuntary.  The trial court determined that
Petitioner was not in custody until he asked
Detective Priem whether he could go home.  The
court ruled that all of the statements that
Petitioner made during the 2:40 a.m. interview,
up to the time that Detective Brown advised
Petitioner or his Miranda rights, were obtained
in violation of Miranda, and had to be excluded.
The court also excluded the videotape of Peti-
tioner's walkthrough of his house and the state-
ments that he made during the walkthrough, as
well as any statements that he made after the
walkthrough.

Finally, with respect to Petitioner's December
21 statements, the court found that Detective
Brown had acted in good faith and that he had
not intentionally violated Miranda, nor deliber-

19

13cv0103

ately conducted a two-step interrogation in order to avoid <u>Miranda</u>, when he obtained incriminating statements from Petitioner before advising him of his rights. For example, the court said, '[W]hen Detective Brown makes the statement, 'I understand,' I think he made that statement. There's no doubt that he made it. It's on the tape and I heard it. I also believe him when he says it [i.e. Petitioner's request to go home] simply did not register with him, and that sort of makes sense when I know how long he's been up and your client has also been up the same amount of time. I have to put that into context when he maybe gets confused and says things. But I believe Detective Brown, and it did not register with him, even though he responded to it. My experience in life is you say things all the time like that. Someone says something that's very important, and we say, 'Yea, fine.' The next thing, you promised to buy your wife something, and you didn't listen to her when she was asking about it. It's one of those things that happens. That's what brings me to the good faith or objective test with <u>Seibert</u>.' The trial court later reiterated this conclusion, stating:

'Well, I still see it the way I saw it before... [W]hat does this word 'deliberate' as used in these cases mean? And I think it means more than they just did something intentional. Deliberate means they want to avoid <u>Miranda</u>. And I do believe Detective Brown when he says it came as a complete surprise to him when he was told that, about page 100, Petitioner had said: 'I just want to go home, man,' and he responded: 'I understand.' I am very cognizant of the fact that both Petitioner and the officers have been up a long time. Frankly, I have seen it in the courtroom towards the end of every long session. The attorneys start to misspeak, and they get tired, and even you admit you are tired. And so the fact he heard the words and said 'I understand,' but they didn't register does not frankly shock me at all. [¶] ... I will not change my ruling from the tentative ruling.'

With respect to the interviews on December 22 and 23, the court found that there was no <u>Seibert</u> problem, in view of the significant lapse in time between the interviews, and because these interviews took place at a location different from the location where the initial interview was conducted. The court also determined that on December 22, Petitioner had not asked for a lawyer, but indicated only that he wanted to

13cv0103

remain silent at that time. Further, as to the December 22 interview, the court found that there was nothing improper about Detective O'Brien's attempt to 'clea[r] up an ambiguous statement' by asking Petitioner whether he was requesting that his mother be present when he seemed to be asking for his stepgrandmother or his parents. In addition, the court determined that as to both of the interviews that took place at juvenile hall, the detectives' <u>Miranda</u> warnings were legally sufficient.

(Lodgment 12 at 3-28.)

**III.  PROCEDURAL BACKGROUND**

On January 23, 2009, the San Diego District Attorney filed a second amended information charging Petitioner with three counts. (Lodgment 1 at 8-14.) Count One was first-degree murder of Officer Bessant, a police officer (Cal. Penal Code § 187(a)), committed while lying in wait (Cal. Penal Code § 189). (Lodgment 1 at 9-12.) The information also alleged special circumstances, including that Petitioner intentionally and knowingly killed a peace officer engaged in the performance of his duties (Cal. Penal Code § 190.2(a)(7); knowingly murdered a peace officer while the officer was engaged in the performance of his duties (Cal. Penal Code § 190(b)); intentionally killed a police officer (Cal. Penal Code § 190(c)(1)); personally used a firearm during the commission of the murder of a peace officer engaged in the performance of his duties (Cal. Penal Code § 190(c)(4)); committed the crime for the benefit of, at the direction of, and in association with a criminal street gang (Cal. Penal Code § 186.22(b)(1)); intentionally and personally discharged a firearm, causing death (Cal. Penal Code § 12022.53(d));

13cv0103

1    and personally used a firearm (Cal. Penal Code §
2    12022.5(a)). (Lodgment 1 at 9-12.)

3         The information also charged Petitioner on Count Two
4    with assault with a firearm on a peace officer engaged in
5    the performance of her duties with respect to Officer
6    Pina. (Cal. Penal Code § 245(d)(1)). (Lodgment 1 at 12.)
7    The information alleged special circumstances during the
8    commission of Count Two, that Petitioner intentionally and
9    personally discharged a firearm (Cal. Penal Code §
10   12022.53(a)), and that Petitioner committed the offense
11   for the benefit of, at the direction of, and in associa-
12   tion with a criminal street gang (Cal. Penal Code §
13   186.22(b)(1)). (Lodgment 1 at 12.)

14        Finally, the information charged Petitioner on Count
15   Three with assault with a semiautomatic firearm as to
16   Castaneda (Cal. Penal Code § 245(b)), and alleged special
17   circumstances that Petitioner personally used a firearm in
18   the commission of this offense (Cal. Penal Code
19   §12022.5(a)) and committed the offense for the benefit of,
20   at the direction of, and in association with a criminal
21   street gang (Cal. Penal Code 186.22(b)(1). (Lodgment 1 at
22   13.)

23        On April 20, 2009, a jury found Petitioner guilty on
24   Count One of first-degree murder while lying in wait and
25   also found true the corresponding special circumstance
26   allegations. (Lodgment 1 at 1103-07.) The jury also found
27   Petitioner guilty on Count Two of assault with a firearm
28   on a peace officer engaged in the performance of her

13cv0103

1   duties and found true the corresponding enhancement
2   allegations. (Lodgment 1 at 1108-11.) The jury acquitted
3   Petitioner on Count Three of assault with a semiautomatic
4   firearm. (Lodgment 1 at 1112.)

5       On June 4, 2009, the trial court sentenced Peti-
6   tioner to a life sentence plus 61 years without the
7   possibility of parole. (Lodgment 1 at 1309-12.) On June
8   23, 2009, Petitioner filed an amended notice of appeal in
9   the California Court of Appeal. (Lodgment 1 at 1313.) On
10  September 29, 2011, in an unpublished opinion, the
11  California Court of Appeal affirmed the convictions,
12  reversed in part the sentence and remanded for modifica-
13  tion of sentence. (Lodgment 12.) The California Court of
14  Appeal stayed the 10-year gang enhancement charge.
15  (Lodgment 12 at 76.) On November 3, 2011, Petitioner filed
16  a Petition for Review in the California Supreme Court.
17  (Lodgment 14.) On January 11, 2012, the Petition was
18  denied without opinion. (Lodgment 14.)

19      On January 14, 2013, Petitioner, proceeding *pro se*,
20  filed a Petition for Writ of Habeas Corpus in this Court.
21  (Pet. at 1.) On June 13, 2013, Respondent filed an Answer
22  to the Petition. ("Answer.")

23

24

25  **IV.   <u>STANDARD OF REVIEW</u>**

26      This Petition is governed by the provisions of the
27  Antiterrorism and Effective Death Penalty Act of 1996
28  ("AEDPA"). <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997).

Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); Early v. Packer, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  See Yarborough v. Gentry, 540 U.S. 1, 4 (2003); Medina v. Hornung, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  See Bell v. Cone, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable applica-tion" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a

particular case.  Id.  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." See Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. See Ylst v. Nunnemaker, 501 U.S. 797, 805-06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Andrade, 538 U.S. at 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim.  See Early, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" id., the state court decision will not be "contrary to" clearly established federal law.  Id.  Clearly established federal law, for purposes of § 2254(d), means "the governing principle

13cv0103

1   or principles set forth by the Supreme Court at the time

2   the state court renders its decision." <u>Andrade</u>, 538 U.S.

3   at 72.

4          Where the state court did not reach the merits of a

5   claim because of the imposition of a state procedural bar,

6   "there is no state court decision . . . . to which to

7   accord deference." <u>Pirtle</u>, 313 F.3d at 1167.  Thus, this

8   Court must review those claims *de novo*.  <u>Id.</u>  However,

9   AEDPA "does not require a state court to give reasons

10  before its decision can be deemed to have been 'adjudi-

11  cated on the merits.'" <u>Harrington v. Richter</u>, 562 U.S. __,

12  131 S. Ct. 770, 785 (2011).  "Rather, as [the Supreme

13  Court] has explained, '[w]hen a federal claim has been

14  presented to a state court and the state court has denied

15  relief, it may be presumed that the state court adjudi-

16  cated the claim on the merits in the absence of any

17  indication or state-law procedural principles to the

18  contrary.'" <u>Johnson v. Williams</u>, __ U.S. __, 133 S. Ct.

19  1088, 1094 (2013) (quoting <u>Richter</u>, 131 S. Ct. at 785).

20  **IV.  <u>DISCUSSION</u>**

21         Petitioner contends that he is entitled to Federal

22  Habeas Corpus relief under United States Code Title 28

23  Section 2254. (Pet. at 11.) In support of this claim,

24  Petitioner alleges the following: (1) the trial court

25  prejudicially erred when it admitted Petitioner's state-

26  ments because the detective deliberately used a two-step

27  procedure calculated to circumvent <u>Miranda</u>, (2) the trial

28

court erred when it denied Petitioner's motion for mistrial because Detective Brown's testimony at trial differed from the facts given in his preliminary hearing proving Detective Brown used a deliberate two-step procedure, (3) Petitioner was denied his Sixth and Fourteenth Amendment rights to present a complete defense when the testimony of an expert witness was excluded, and (4) there were cumulative and collective errors creating prejudice, thus reversal is mandated. (Pet. at 6-9.)

### A.  *Petitioner's Statements*

Petitioner challenges the admissibility of the statements that he made during four interviews: (1) the midnight interview conducted at the police station after the murder, (2) the 3:30 a.m. interview conducted at the police station after the murder, (3) the December 22, 2009, attempted post-arrest interview at juvenile hall, and (4) the December 23, 2009, interview at juvenile hall. Petitioner contends that the interviews violated his Fifth and Fourteenth Amendment rights, on the grounds that his statements were coerced and that officers had violated his rights under Miranda and Seibert. Petitioner bases his argument on being subjected to a deliberate two-step interrogation and the facts that he was young, unsophisticated, mostly undressed, cold, and sleep-deprived.

### 1.  *The Midnight Interview*

Petitioner claims his statements to the police during the midnight interview were obtained in violation of Miranda. Miranda bars the prosecution from using

statements stemming from "custodial interrogation" unless the defendant was first warned of his constitutional rights.  Stansbury v. California, 511 U.S. 318, 322, 114 S. Ct. 1526 (1994) (*per curiam*); See Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Two requirements must be met in order for the Miranda safeguards to apply: (1) the suspect must be in "custody," and (2) the questioning must meet the legal definition of "interrogation." Berkemer v. McCarty, 468 U.S. 420, 428, 104 S. Ct. 3138 (1984). Custody for purposes of Miranda is when a person is deprived of his or her freedom in any significant way or is led to believe, as a reasonable person, that he or she is so deprived. Howes v. Fields, – U.S. –, 132 S. Ct. 1181, 1189 (2012). Interrogation consists of express questioning or police officer's words or actions he or she should know are reasonably likely to elicit an incriminating response. Rhode Island v. Innis, 446 U.S. 291, 301-02, 100 S. Ct. 1682 (1980).

The Supreme Court has repeatedly emphasized that custody for purposes of Miranda is determined by an objective inquiry. J.D.B. v. N. Carolina, – U.S. –, 131 S. Ct. 2394, 2402-03 (2011). To ascertain whether a suspect is in custody, the courts look to the objective circum-stances surrounding the interrogation, not the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury, 511 U.S. at 322.

13cv0103

A child's age in some circumstances may have an effect on how a reasonable person in the suspect's position would perceive his or her freedom to leave. Stansbury, 511 U.S. at 325. "[A] reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." J.D.B., 131 S. Ct. at 2402-03. Although, the Supreme Court has continuously held that "teenagers nearing the age of majority" are likely to react to an interrogation as would a "typical 18-year-old in similar circumstances." Id. at 2406. A state court decision that fails to mention a 17-year-old's age as part of the Miranda custody analysis is not objectively unreasonable under the deferential standard of review set forth by AEDPA. J.D.B., 131 S. Ct. at 2405.

Here, the Court of Appeal's determination that Petitioner was not in custody during the midnight interview was objectively reasonable. The Court of Appeal looked to the objective circumstances surrounding the midnight interview and found that numerous facts weighed against a finding of custody. First, Petitioner was told on a number of occasions that he was not under arrest. (Lodgment 12 at 22, 31.) Second, Petitioner was told the handcuffs were a precaution for officer safety and were repositioned in order for Petitioner to be more comfortable. (Id. at 14, 22, 31.) Third, after an officer offered him a blanket, Petitioner voluntarily went to the police station. (Id.) Fourth, Petitioner was treated as

a witness and was informed that he was free to go home at any time. (Id. at 22, 31.)  Moreover, Petitioner's aunt and uncle accompanied him to the police station and remained there in a different room while he was being interviewed. (Lodgment 6 at 3594; Lodgment 12 at 14.) The Court of Appeal's failure to address Petitioner's age (17; nearly an adult) as a factor does not change this analysis. As a result, the Court of Appeal reasonably concluded that the facts of the midnight interview do not objectively convey "custody" for the purposes of Miranda.

The Court of Appeal's finding that Petitioner's interview became custodial upon telling Detective Priem shortly before 2:00 a.m. that he wanted to go home was also objectively reasonable.  As a result, this court finds that Petitioner's statements made during the 2:40 a.m. interview were properly suppressed by the trial court and will not be discussed further herein.

Detective Priem was asked to sit with the Petitioner while Detective Brown attended a briefing without knowing any information about who Petitioner was or what he was doing at the station. (Lodgment 6 at 3488-89.)  Furthermore, Detective Brown did not objectively discern Plaintiff was a minor simply by observing his outward looks or demeanor; she only learned that he was a minor after engaging in casual conversation with him.[10]     (Id. at 3492.)  When Petitioner asked Detective Priem if he could

---

[10]/This provides further support for the fact that the Court of Appeal's failure to address Petitioner's age regarding the midnight interview, *supra*, was not unreasonable.

leave, she stated that she did not know what was going on, that he would have to leave with his mother because of his age, and that he should put his head down and rest. (Id. at 3493.) Detective Priem asked another detective to sit with Petitioner while she checked to see if his mother was still there. (Id. at 3494.) A short while later, Detective Priem returned and reassured Petitioner that his mother was still there and would wait for him. (Id. at 3495.) When Detective Brown returned, he and Detective Priem did not discuss what Petitioner said to her or what she had said to Petitioner while she was in the room. (Id. at 3493-94.)

Under these circumstances, a reasonable person nearing the age of majority could likely be lead to believe that he was deprived of his freedom to leave the police station since he was told he would have to wait to leave with his mother. As such, the Court of Appeal reasonably concluded that Petitioner's interrogation became custodial when he asked to leave the police station and the request was denied.

The facts above make it clear to this Court that the state-court adjudication of Petitioner's claim regarding Miranda did not involve an "unreasonable application" of clearly established law. Relief is available under 28 U.S.C. § 2254(d)(1) only if the state court's decision is objectively unreasonable. See Williams, 529 U.S. at 410; Andrade, 538 U.S. at 75.

   2.   The 3:30 a.m. Interview

Petitioner claims that Detective Brown deliberately employed a two-step question-first technique that rendered his *Miranda* waiver unknowing and unintelligent. (Pet. at 6.) Petitioner argues that the trial court erred by admitting his post-warning statements during the 3:30 a.m. interview because they were obtained in violation of *Seibert*. (Pet. at 6.)  As discussed *supra*, by the time of Petitioner's 3:30 a.m. interrogation, he was in custody for purposes of *Miranda*. Therefore, this Court must determine if it was Detective Brown's intent during the 3:30 a.m. interrogation to undermine the *Miranda* warnings. This Court concludes, like the trial judge, that Detective Brown had no such intent.

Justice Souter's plurality opinion in *Seibert*[11/] discussed the validity of the police technique "question first, warn later," and concluded that this technique could undermine the very purpose of the *Miranda* warnings. "A two-step interrogation involves eliciting an unwarned confession, administering the *Miranda* warnings and obtaining a waiver of *Miranda* rights, and then eliciting

_____

[11/]In *Missour v. Seibert*, an officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'"  *Seibert*, 542 U.S. at 605-06.  Employing this "question-first practice," the interrogating officer left the defendant alone in an interview room at the police station for 15 to 20 minutes, then "questioned her without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating" an accusatory remark.  *Id.* at 604-05, 611.  After the defendant confessed and was given a 20-minute break, the officer read her the *Miranda* warnings, resumed the questioning by mentioning their previous conversation, "and confronted her with her prewarning statements."  *Id.* at 605.

a repeated confession." <u>United States v. Narvaez-Gomez</u>, 489 F.3d 970, 973-74 (9th Cir.2007) (<u>citing</u> <u>Seibert</u>, 542 U.S. at 609-10). The plurality examined whether "it would be reasonable to find that in these circumstances the warnings could function 'effectively' as <u>Miranda</u> requires." <u>Seibert</u>, 542 U.S. at 611-12. The plurality opinion also noted that giving <u>Miranda</u> warnings midstream "without expressly excepting the statement just given, could lead to an entirely reasonable inference that what [the accused] has just said will be used, with subsequent silence being of no avail." <u>Id.</u> at 613. The plurality determined that the circumstances of the second confession did not "reasonably support a conclusion that the [<u>Miranda</u>] warnings given could have served their purpose [to reduce the risk of admitting coerced confessions]." <u>Id.</u> at 617.

In his concurring opinion, which is also the legal standard,<u>12</u>/ Justice Kennedy held the "admissibility of post-warning statements should continue to be governed by the principles of <u>Elstad</u>13/ unless the deliberate two-step strategy was employed." <u>Id.</u> at 622. "If the deliberate

_____

<u>12</u>/Justice Kennedy's concurring opinion is the legal standard from <u>Seibert</u> because when applied, it produced results with which the majority of the Court could agree. <u>See</u> <u>U.S. v. Williams</u>, 435 F.3d 1148, 1157-58 (9th Cir. 2006); <u>See also</u> <u>Marks v. United States</u>, 430 U.S. 188, 193, 97 S. Ct. 990 (1977). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." <u>Id.</u>

<u>13</u>/<u>Oregon v. Elstad</u>, 470 U.S. 298, 105 S. Ct. 1285 (1985).

two-step strategy has been used, post-<u>Miranda</u> warning statements that are related to the substance of pre-<u>Miranda</u> warning statements must be excluded unless curative measures are taken before the post-<u>Miranda</u> warning statement is made." <u>Seibert</u>, 542 U.S. at 622. Justice Kennedy suggested that "an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be [a] sufficient" curative measure. <u>Id.</u> Thus, where a deliberate two-step strategy is not used, a subsequent administration of <u>Miranda</u> warnings to a suspect who has given a prior voluntary but unwarned statement should suffice to remove the conditions that precluded admission of the earlier statement if the suspect made a rational and intelligent choice to waive his rights. <u>See Seibert</u>, 542 U.S. at 622; <u>Oregon v. Elstad</u>, 470 U.S. at 314.

In <u>United States v. Williams</u>, 435 F.3d 1148, 1158 (9th Cir. 2006), the Ninth Circuit held that to determine the interrogator's intent to undermine the <u>Miranda</u> warnings, courts should examine objective evidence and any available subjective evidence, such as an officer's testimony. The following factors determine the relevant objective evidence: (1) the completeness and detail of the questions and answers in the first round of interrogation, (2) the overlapping content of the two statements, (3) the timing and setting of the first and the second, (4) the continuity of police personnel, and (5) the degree to which the interrogator's questions treated the second

round as continuous with the first. See Seibert, 542 U.S. at 615; Williams, 435 F.3d at 1159.

Here, the Court of Appeal found there was enough substantial evidence to support the trial court's decision in not finding a deliberate two-step technique. The Court of Appeal noted that the detectives had very little evidence surrounding the shooting. There was no evidence in the record concerning an official police policy of deliberately withholding Miranda warnings until Petitioner had confessed. Petitioner could not cite to the record or present any evidence in support of his assertion that the detectives in this case deliberately withheld their Miranda advisement until Petitioner had incriminated himself. The Court of Appeal also stated that Detective Brown's testimony was evidence against a deliberate two-step technique because he testified that he believed Petitioner was a witness and not in custody. Detective Brown testified that when he felt there was probable cause that Petitioner was involved in the shooting, he issued Miranda warnings to Petitioner. The Court of Appeal examined the completeness and detail of Petitioner's initial statements to the Detectives, which the court found fell far short of a complete rendition of the circumstances surrounding the shooting, although they were confessionary in nature.

This Court finds that the Court of Appeal's determination that the police did not deliberately utilize a two-step strategy was objectively reasonable. Detective

13cv0103

Brown firmly maintained in his testimony that he did not deliberately use a two-step strategy. Detective Brown was unaware that Petitioner asked Detective Priem during the break if he could go home. Moreover, Detective Brown testified that he was in the middle of a thought when Petitioner stated he wanted to go home and it did not register in Detective Brown's mind that Petitioner made that statement. He maintained that he was in disbelief when the prosecutor later informed him that Petitioner stated he wanted to go home during the interview. The trial court observed Detective Brown's demeanor while he testified, watched the video of the interviews, and found credible Detective Brown's testimony about how he may have missed Petitioner's request to go home.

In addition, Detective Brown did not exploit the pre-Miranda warned admission to pressure Petitioner into waiving his right to remain silent. Detective Brown also did not rely on Petitioner's pre-Miranda warning statement to obtain the post-Miranda warning statement. The post-Miranda warning interview did not resemble a cross-examination where the officer confronts a petitioner with his inadmissible pre-Miranda warning statements and pushes him to acknowledge them. None of the objective factors, and none of the evidence before the Court, necessarily demonstrates that Detective Brown was untruthful or that the police used a deliberate strategy to circumvent Miranda.

13cv0103

Furthermore, Petitioner has not produced any "clear and convincing evidence" sufficient to rebut the presumption of correctness applicable to the state courts' deliberateness determination under 28 U.S.C. Section 2254(e)(1). <u>See</u> <u>Taylor v. Maddox</u>, 366 F.3d at 999–1000 (once a state court's fact finding process survives intrinsic review under section 2254(d)(2), state court's findings are entitled to a presumption of correctness under section 2254(e)(1)).

For the foregoing reasons, the Court of Appeal's rejection of Petitioner's claim that the trial court erred under <u>Seibert</u> in admitting evidence from Petitioner's 3:30 a.m. interview was not contrary to or an unreasonable application of clearly established federal law. Moreover, it was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d); <u>Harrington v. Richter</u>, -- U.S. --, 131 S. Ct. 770, 785–87 (2011).

### 3.   *The December 22 and 23 Interviews*

Petitioner claims that detectives violated <u>Miranda</u> by reinitiating the interrogation on December 22 and 23 after Petitioner had invoked his right to silence during the December 21 walkthrough. In <u>Berghuis v. Thompkins</u>, 560 U.S. 370, 130 S. Ct. 2250, 2260 (2010), the U.S. Supreme Court held "there is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of <u>Miranda</u> rights results in an

objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." The <u>Thompkins</u> Court went on to state that there is no principled reason to adopt a different standard for determining when an accused has invoked the <u>Miranda</u> right to remain silent. Therefore, the right to remain silent must be invoked unambiguously.

Petitioner claims that he invoked his right to silence during the December 21 walkthrough. Petitioner's only statement on the record pertaining to an invocation of silence is Petitioner's question: "[d]o I still have the right to remain silent?" Detective Brown responded, telling Petitioner he still had the right to remain silent. After Detective Brown's response, Petitioner continued answering questions and conducting the walkthrough. Petitioner's question did not clearly and unequivocally demonstrate that he invoked his right to remain silent. Thus, the officers did not violate <u>Miranda</u> by reinitiating the interrogation on December 22 and 23.

Petitioner also challenges the statements made on December 22 and 23 at juvenile hall. However, Detectives did not question Petitioner on December 22 after reissuing <u>Miranda</u> warnings because Petitioner stated that he could not 'talk about anything until my parents get here or until I have both my parents present or my lawyer.' Detective Brown then asked if he would be willing to talk if Petitioner's stepgrandmother, Pua, was present and Petitioner agreed.

13cv0103

On December 23, Detective Brown and Pua went to juvenile hall where Detective Brown again reissued <u>Miranda</u> warnings to Petitioner.  After Detective Brown reissued the <u>Miranda</u> warnings, Petitioner talked about shooting Officer Bessant.  There is nothing in the record that demonstrates that Petitioner clearly and unequivocally stated that he was invoking his right to remain silent or invoking his right to counsel.  Thus, Petitioner's contention that he invoked his <u>Miranda</u> rights is without merit, since the record does not show that Petitioner unequivocally invoked any of his <u>Miranda</u> rights.

For the foregoing reasons, the state courts' rejection of Petitioner's claim that the trial court erred under <u>Miranda</u> in admitting evidence from Petitioner's December 22 and 23 interviews was not contrary to or an unreasonable application of clearly established Federal law.  Further, it was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>See</u> 28 U.S.C. § 2254(d).

### 4. Coerced Or Involuntary Statements

Petitioner challenges the admissibility of the statements that he made during the interviews because they were coerced and involuntary. The accused's statement during a custodial interrogation are admissible at trial if it can be established that the accused "in fact knowingly and voluntarily waived [<u>Miranda</u>] rights" when making the statement. <u>North Carolina v. Butler</u>, 441 U.S. 369, 373, 99 S. Ct. 1755 (1979).

13cv0103

Waiver has two distinct dimensions: "waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Thompkins, 130 S. Ct. at 2260. Determining whether a confession is voluntary depends on whether the defendant's will was overborne at the time he confessed. See Haynes v. Washington, 373 U.S. 503, 513, 83 S. Ct. 1336 (1963).

The court must determine under the circumstances whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." Beaty v. Stewart, 303 F.3d 975, 992 (9th Cir. 2002); See also Hutto v. Ross, 429 U.S. 28, 30, 97 S. Ct. 202 (1976). "The test is whether the confession was 'extracted by any sort of threats or violence, (or) obtained by any direct or implied promises, however slight, (or) by the exertion of any improper influence.'" Hutto, 429 U.S. at 30; Bram v. United States, 168 U.S. 532, 542-43, 18 S. Ct. 183 (1897).

Encouraging a suspect to tell the truth is not coercion. Amaya-Ruiz v. Stewart, 121 F.3d 486, 495 (9th Cir. 1997). Also, "misrepresentations linking a suspect to a crime or statements which inflate the extent of evidence against a suspect do not necessarily render a confession involuntary." Id.; see also Frazier v. Cupp, 394 U.S. 731,

739, 89 S. Ct. 1420 (1969); <u>United States v. Miller</u>, 984 F.2d 1028, 1031 (9th Cir.1993).

Petitioner argues that his inculpatory statements were coerced because he was young, unsophisticated, mostly undressed, cold, and sleep-deprived at the time he made the statements. In addition, Petitioner contends the interrogating officers made coercive statements by encouraging him to tell the truth. Also, Petitioner claims the interrogating officers lied to him by misrepresenting that a witness had identified him in a photographic lineup.

The conditions of Petitioner's interrogation are similar to <u>Amaya-Ruiz</u>[14]. The totality of the circumstances surrounding the atmosphere of Petitioner's questioning was not coercive. Detectives suggested that Petitioner should rest and offered him something to eat or

_____

[14] In <u>Amaya-Ruiz</u>, Petitioner argued the atmosphere of his questioning was coercive because, during the questioning, he was wearing only a blanket and underwear; he had been detained since 12:15 a.m. and was not questioned until 9:30 a.m.; and he had not slept or had anything to drink or eat during the night. In addition Amaya-Ruiz contended the interrogating officers made coercive statements by encouraging him to tell the truth. Also, Petitioner claimed the interrogating officers lied to him by misrepresenting that a witness had seen him leaving in a stolen truck and they preyed on his lack of intelligence and education.

The Ninth Circuit held the atmosphere surrounding the questioning of Petitioner was not coercive. The court stated that the cell had a bench on which Petitioner could sleep, agents offered him something to eat or drink, and the officers' voices were calm and not threatening. Also, the fact that he had no clothing was not coercive because they provided him with a blanket. The court found that the officers' statements were not "sufficiently compelling" to overbear Petitioner's will and that the misrepresentation does not amount to coercion. Since, Petitioner had not established that his confession was the product of coercion, his alleged lack of intelligence and education does not render his confession involuntary.

13cv0103

drink.  (Lodgment 12 at 40.)  Additionally, Petitioner was provided with a blanket in order to stay warm.  (Id.) Detective Brown did not use any threats and kept his voice calm and respectful.  (Lodgment 12 at 40, 42.)  Detective Brown's statements were not "sufficiently compelling" to overbear Petitioner's will and the misrepresentation does not amount to coercion.  Moreover, when the detectives were leaving the interrogation room, Petitioner asked if he could continue to speak with them when they returned. (Lodgment 12 at 42.)  Finally, since Petitioner had not established that his confession was the product of coercion, his alleged lack of intelligence and education does not render his confession involuntary.

For the foregoing reasons, the state courts' rejection of Petitioner's claim that the trial court erred in admitting statements from Petitioner's interviews was not contrary to or an unreasonable application of clearly established federal law.  Further, it was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. See 28 U.S.C. § 2254(d). In sum, this Court finds that Petitioner is not entitled to Habeas Corpus relief on Ground One.

B.   Detective Brown's Trial Testimony

Petitioner argues that the trial court erroneously denied his motion for a mistrial based on the fact that Detective Brown's trial testimony materially differed from his preliminary hearing testimony, which illustrated a Seibert violation.  Petitioner alleges that Detective

13cv0103

Brown's testimony at trial materially differed in three factual parts from his pretrial testimony, proving that Petitioner was treated as a suspect rather than a witness. Petitioner contends the following parts prove Detective Brown's subjective intent: (1) the information Detective Brown received during the two hour break, (2) Detective Brown's testimony explaining the reason for him riding in the back seat of the transport vehicle with Petitioner, and (3) Detective Brown's increasing suspicion of Petitioner's involvement. Petitioner argues that the difference in the testimony suggests that Detective Brown deliberately violated <u>Miranda</u> under the holding in <u>Seibert</u>, and thus calls into question the trial court's findings of fact as to Detective Brown's subjective intent during the interviews.

Petitioner's challenge to the trial court's denial of his mistrial was reviewed under the abuse of discretion standard by the Court of Appeal. The Court of Appeal specifically addressed the three areas that Petitioner claimed were materially different in Detective Brown's trial testimony from his preliminary hearing. The Court of Appeal found the record made clear that Detective Brown's testimony at the preliminary hearing and his testimony at trial was substantially similar.

First, the Court of Appeal held that Detective Brown's testimony with respect to the information he obtained during the two hour break was generally consistent as to the pertinent information. Detective Brown

indicated during the preliminary hearing and during Petitioner's trial that he was aware that someone matching the description of Petitioner ran into Petitioner's house carrying what was believed to be a rifle. The fact that he used the word "identified" at trial versus "meeting his general description" is not materially different.

Second, the Court of Appeal held that Detective Brown's testimony at trial with respect to sitting in the back seat of the transport vehicle as a safety precaution did not undermine Detective Brown's pretrial testimony that he understood that Petitioner was to be treated as a witness. Detective Brown's testimony was unwavering that he treated Petitioner as a witness during the initial interview. Detective Brown's safety precaution en route to the police station is not inconsistent with his testimony that he considered Petitioner merely as a witness prior to Petitioner's admission regarding his role in the shooting.

Lastly, Detective Brown's increasing suspicion of Petitioner was not a question that he was asked at the pretrial hearing or suppression motion hearing. There-fore, the statement at trial cannot be seen as being materially different from his pretrial or suppression hearing testimony. Also, there is no "requirement of warnings to be imposed simply because... the questioned person is one whom the police suspect." Mathiason, 429 U.S. at 495. Detective Brown's increasing suspicion does

13cv0103

not mean he deliberately engaged in a two-step interroga-tion to avoid advising Petitioner of his <u>Miranda</u> rights.

For the foregoing reasons, the Court of Appeal's rejection of Petitioner's claim that the trial court erred in denying Petitioner's motion for a mistrial on the basis that Detective Brown's testimony was materially different was not contrary to or an unreasonable application of clearly established Federal law. It also was not an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. <u>See</u> 28 U.S.C. § 2254(d). Thus, Petitioner is not entitled to Habeas Corpus relief on Ground Two.

C.  *Exclusion of Expert Witness*

Ground Three of the Petition claims that the trial court abused its discretion when it refused to let Petitioner present expert testimony about the factors related to the reliability and accuracy of Petitioner's confessions. Petitioner alleges a violation of his federal right to procedural due process because of the trial court's exclusion of his proffered expert testimony on the general psychological factors and police techniques that can lead to false or unreliable confessions.

During pretrial discussions with both counsel, the court indicated that it reserved a ruling on the admissib-ility of expert testimony until after the prosecution presented its case. (Lodgment 12 at 54.) The court stated, "[a]ssuming that you think that Doctor Leo would be helpful to the jury, again, I emphasize the ultimate

13cv0103

issue I have to decide.   I would say we should let the jury go, have a 402[15/] hearing for a whole day, and decide what it is he's going to testify to . . ." (Id.) The trial court suggested briefly that the testimony of the defense counsel's expert witness may fall within the knowledge of the jurors and may therefore be excluded.

Defense counsel reiterated that he was uncertain whether he would call Doctor Leo until after the prosecution had presented its case. Upon conclusion of the prosecution's case, defense counsel called one witness and then rested *without* calling Doctor Leo. Defense counsel did not seek a hearing under California Evidence Code Section 402 regarding Doctor Leo's potential testimony and the trial court never made an ultimate ruling on Doctor Leo's testimony.

The Court of Appeal agreed with the trial court's finding that the defense counsel made a tactical decision not to present Doctor Leo because there was potential that his testimony could open the door for the prosecution to ask Doctor Leo about statements made by Petitioner that had otherwise been excluded. The Court of Appeal also noted that the trial court's statement in the minute order denying the defendant's request for a California Evidence

_____

[15/]California Evidence Code § 402 states: (a) When the existence of a preliminary fact is disputed, its existence or nonexistence shall be determined as provided in this article. As used in this article, "preliminary fact" means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence. The phrase "the admissibility or inadmissibility of evidence" includes the qualification or disqualification of a person to be a witness and the existence or nonexistence of a privilege.

Code Section 402 hearing was not in the transcript record. The Court of Appeal stated that the trial court relied upon the reporter's transcript rather than the minute order. Thus, the Court of Appeal held that defense counsel's indication that he did not intend to elicit Doctor Leo's testimony together with the defense resting its case before the parties discussed Doctor Leo's testimony further did not create a claim for exclusion of an expert witness.

This Court agrees that defense counsel made a strategic decision not to call Doctor Leo as a defense witness. Therefore, Petitioner's claim of error regarding the exclusion of an expert witness is without merit. Moreover, the trial court would not have abused its discretion in denying Dr. Leo's testimony, had he been called as a witness, because the subject matter to which he was expected to testify did not require expert testimony. "A ... court does not abuse its discretion when it refuses expert testimony where the subject does not need expert 'illumination' and the proponent is otherwise able to elicit testimony about the subject." <u>United States v. Ortland</u>, 109 F.3d 539, 545 (9th Cir. 1997), <u>citing</u> <u>United States v. Castaneda</u>, 94 F.3d 592, 596 (9th Cir. 1996); <u>see also</u> <u>United States v. Adams</u>, 271 F.3d 1236, 1245 (10th Cir. 2001)(noting that there are a variety of reasons to exclude expert testimony related to the credibility of a confession including that it encroaches on the jury's vital function to make credibility determinations). Since

13cv0103

the Court finds that it was an objectively reasonable application of clearly established federal law, Petitioner is not entitled to Habeas Corpus relief on Ground Three.

D.   *Cumulative Errors*

Finally, Petitioner asserts the cumulative and collective errors individually and cumulatively in whole, and in part, caused him prejudice. Petitioner alleges that his right to fundamental fairness at trial, as guaranteed under due process, was violated as a result of these errors.

Reviewing courts have acknowledged the possibility that in some cases, "[t]he cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal." <u>Parle v. Runnels</u>, 505 F.3d 922, 927 (9th Cir.2007), <u>citing</u> <u>Chambers v. Mississippi</u>, 410 U.S. 284, 290, 93 S. Ct. 1038 (1973). However, as discussed *supra*, Petitioner has failed to demonstrate that any errors, let alone errors of a constitutional dimension, occurred in his case. Accordingly, "there is nothing to accumulate to a level of a constitutional violation." <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 957 (9th Cir. 2002).

In sum, Petitioner's claim that there were cumulative and collective errors that caused prejudice is unfounded. The Court cannot conclude that the state court's rejection of his claim was an objectively unreasonable application of clearly established federal law.

13cv0103

Therefore, Petitioner is not entitled to Habeas Corpus relief on Ground Four.

## V.   CONCLUSION

After a review of the record in this matter, the undersigned Magistrate Judge concludes that Petitioner's Petition for Writ of Habeas Corpus Should be DENIED.

This Report and Recommendation of the undersigned Magistrate Judge is submitted to the United States District Judge assigned to this case, pursuant to the provision of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that no later than <u>November 7, 2013</u>, any party may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than <u>November 21, 2013</u>.   The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   See <u>Turner v. Duncan</u>, 158

F.3d. 449, 455 (9th Cir. 1998), <u>Martinez v. Ylst</u>, 951 F.2d
1153 (9th Cir. 1991).


DATED:  October 10, 2013


_____
Hon. William V. Gallo
U.S. Magistrate Judge

13cv0103